## JONES *v.* JONES.

---

DIVORCE; ADULTERY.

1. *Quære,* whether a petition for divorce is sufficient, which instead of observing strictly the terms of the rule of the lower court providing that " No divorce shall be granted for adultery unless the petition, duly verified, charges that the adultery was committed without the consent," etc., of the petitioner and " that after the discovery of the offense the petitioner has not voluntarily cohabited with the defendant," charges " that after the discovery of said offenses the complainant has not cohabited or in any other manner condoned the same."

2. Where, in an *ex parte* proceeding for divorce by a husband against his nonresident wife, the testimony is such as to excite grave suspicion of collusion or connivance, if nothing more, on the part of the petitioner, the petition is properly dismissed.

No. 1179. Submitted April 4, 1902. Decided May 6, 1902.

HEARING on an appeal by the complainant·from a decree of the Supreme Court of the District of Columbia dismissing a petition for divorce.                    *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. George C. Aukam* for the appellant.

There was no appearance for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The bill in this case was filed by the appellant James W. Jones, for the purpose of obtaining a divorce *a vinculo matrimonii,* from his wife, Ida M. Jones. The bill was filed June 23, 1900, and the cause alleged for the divorce is adultery of the wife.

In the bill it is alleged that the complainant has resided in the District of Columbia for more than twenty years immediately preceding the filing of the bill, and that the defendant, Ida M. Jones, moved to and has resided in the State of Texas since the year 1885. It is alleged that the complainant and the defendant were married in the District of Columbia on the 24th day of February, 1885, and that the defendant left him three days thereafter, and went to Waco, in the State of Texas, where she has remained ever since. It is charged that, on the 13th of July, 1887, the defendant was married to one John A. Allen, and that at various times, between the date of the marriage and the time of filing the bill, the defendant committed adultery with said Allen, and with others; and that such acts of adultery were all committed without the consent, connivance, privity, or procure-

ment of the complainant, " and that since the discovery of said offenses, the complainant has not cohabited or in any other manner condoned the same."

The complainant prayed for process by publication, and that he be granted an absolute divorce.

Whatever may have been the true state of the record in the court below, the transcript brought into this court does not show that there was any affidavit of a disinterested witness, that the defendant was a nonresident of the District, or that a summons was issued and returned, or that notice was given the defendant by publication, as directed and required by Section 735, Revised Statutes, District of Columbia.

The defendant did not appear and the case proceeded wholly *ex parte.* There was but a single witness examined, and she was the sister of the complainant, and the stepmother of the defendant.

The court below took exception to the allegation of the bill, because it did not comply with or conform to the requirement of the rule of court, which declares that " No divorce shall be granted for adultery, unless the petition, duly verified, charges that the adultery was committed without the consent, etc., and that after the discovery of the offense the petitioner has not voluntarily cohabited with the defendant." The petition, instead of observing strictly the terms of the rule, charges " that after the discovery of said offenses the complainant has not cohabited or in any other manner condoned the same."

The learned justice below dismissed the bill, principally upon the ground of the non-compliance by the complainant with the rule of court, though he was of opinion, that, according to the evidence, the complainant was not in a position to ask for and receive relief from the court. On this latter ground, if on no other, we think the court entirely right in dismissing the bill.

It is manifest, from what we have before us, that the case is very imperfectly disclosed. There are several things in the case well calculated to excite suspicion as to the motive and objects of this proceeding. The circumstances attending

the marriage and the almost immediate separation of the parties, certainly required some explanation; but all attempt at such explanation would seem to be studiously withheld. The one single witness examined, though others certainly could have been produced, was the sister of the complainant, and stepmother of the defendant; and this witness lets drop several things that afford an insight of the case that was not designed to be brought to light by the complainant, and which do not reflect credit on the complainant, or show him to be the injured husband that he would pretend to be. That the marriage of the wife to Allen in Waco, in 1887, was an event of which he did not feel aggrieved is entirely clear from what is disclosed in his sister's testimony, and the time he allowed to elapse before complaining of it. The sister was asked by counsel, whether she knew that the defendant, Ida M. Jones, was married to John A. Allen on or about July 13, 1887. To which she replied: " Only from what I saw in the news-papers. It was printed in the newspaper that I gave my brother; that is all I know about it." " Ques. Is this slip what you refer to as having been printed in the paper and given by you to your brother (handing witness newspaper clipping) ? A. Yes, sir." She was then asked where she lived on the 13th of July, 1887, and her reply was, that she lived in Waco. And in reply to the question, from what paper she obtained the slip, shown and filed as an exhibit, she said: " From a paper in Waco, I think it was. Yes; my husband (the father of the defendant), cut it out of some paper, but I cannot tell you just what paper it came from." The newspaper slip referred to is an announcement of the marriage of a Captain J. A. Allen and the daughter of a Doctor Woodyard of Waco, and this father is shown, by the certificate of marriage, to have been one of the witnesses to the ceremony.

The witness was then asked whether she had ever been called before the grand jury in Texas as to this marriage; to which she replied: " I was called up before the grand jury in regard to my brother. Ques. Isn't it a fact that the defendant, Ida M. Jones, requested you to state that James

W. Jones, your brother and complainant here, was dead?
Ans. No, sir; she believed he was dead; her father swore he
was dead; he went off and left her and she hadn't heard from
him for so long that she believed he was dead, and she wore
black for him, she went into black for him. Ques. As a
matter of fact, wasn't that simply put up, so that she could
marry Allen? Ans. No, sir; she believed him dead. It
might have been put up on her father's side." She then
said that her husband, the father of the defendant, had re-
ceived letters from the daughter, and they had been placed
in the hands of the complainant, and the latter had produced
them at the examination of the witness. The witness was
asked to look at one of these letters, and state whether the
defendant had not requested her to circulate the story that
her husband, the complainant, was dead. Looking at the
letter, the witness replied: " Yes, sir; that is just the way
she writes and talks. She wanted me to say he was dead,
and she supposed he was dead from the way he had acted;
she had not heard a word from him, you know."

Continuing the examination, the witness was asked
whether the complainant resided in Washington; to which
she replied: " Now I suppose so; for a while. I do not
know how long he is going to stay here."

In the further course of the examination, the witness was
asked to state what was said to her when she was called before
the grand jury. Her answer was: " They asked me to let
them know if I found my brother. Ques. Did you ever find
your brother? Ans. Yes, sir; and I wanted to write and tell
them, but he said no, to let the matter drop, and for me not
to do anything of the kind. Ques. What caused the bring-
ing of this matter before the grand jury in Texas? Ans.
Well, I am not sure. I don't know; they wanted to know
where my brother was, and if I could tell whether he was
dead, and I told them I could not; we had not heard from
Will for nine years, and I did not know whether he was dead
or not. He married Ida for spite, and went off and left her,
and we didn't hear from him for over nine years."

In reply to the question whether she knew where Allen then was, she said:   " In an insane asylum in New York, I have heard."

It is unnecessary to state more of the testimony of this witness.   Her relations to all the parties concerned were peculiar, and she appears to have testified under very conflicting feelings and motives; and consequently her evidence is far from being in all respects consistent and reconcilable.   There is, however, enough developed in her testimony to show the character of the case, and that it is based upon a degree of artifice and deception that is rarely excelled even in this class of cases.   There seems to be a mystery in regard to the marriage and separation of the parties, which has not been revealed or explained, either by allegation or evidence.   The witness, the sister and stepmother, in her testimony, makes an allusion, or rather an unexplained statement in regard to the conduct of the complainant towards his wife, that affords ground for a strong inference against him.   The witness declared that she had never corresponded with the defendant, — that girl as she calls her — " after my brother married her and treated her as he did."   What was the nature of the treatment alluded to is not stated, and, it would seem, the complainant was not sufficiently inclined or specially interested in having the explanation made by the witness.   The evidence in the case tends strongly to show collusion in the getting up and prosecution of this proceeding, as between the complainant and the father of the defendant, and, it may be, the defendant herself.   The letters and newspaper clippings that were produced on the examination of the witness for the complainant, appear to have been furnished and placed in · the control and possession of the complainant, as means of establishing the guilt of the defendant, by her father; and he seems to have encouraged the marriage of the defendant with Allen.   The whole proceeding was infamous in the extreme. As showing the character of the artifice · and deception to which the parties resorted, to accomplish their purpose, it may not be amiss to quote from one of the letters of the defendant to her father, and which has been produced by the

complainant. The letter as it appears in the record is without date, but it appears to have been written before the marriage to Allen. The writer addressed it to her " dear papa," and she says: " Enclosed you find a letter he (meaning Allen) wrote me. I have just written to him & told him of Will's death, & also told him to send me a handsome black suit — I will get me a lovely suit. Papa, in regard to Mrs. Hamilton — we did not dream of taking any aprons, but we did beat her of 3 days board, & sold my little satchel to a woman for $2; she now sees where we got the best of her, and she is telling a story on us. Papa, if Mr. H. writes to you again you tell her that I am in Knoxville, Tenn.; and but you think it best I will send you the money so you can pay her. I told Allan that I reached this place last night. Papa, we will stay here until I hear from Allan & then I will go up to Dallas; you get Ma to write and tell Mrs. Krammer that Will is dead and then it will sail over Waco. Tell Ma I will send her a fine Christmas present. Papa I don't want to marry Allan for some time, but I can get all he has, so what use is there in me marring him. I told Mrs. Holtzman that you often sent me twenty dollars, and everybody thinks you are the one that gives me the money. I expect I will get $15 from Roller; if I do I will tell. I told Allan that we heard of Will's death 5 days ago & that I would have written him before this, but was too sad. Papa, Allan is very ignorant, but it just as kind & good as can be. Pa, I only wish you could see the diamonds I have of his. Look on my hand in my picture; what did Ma think of my picture; write me a long letter & me something good, so I can send the letter to him. See what she says in this letter about him. Write me so that I can enclose it to him. * * * I am going to write to Miss Kraemmer and tell her that Will is dead * * * ."

This letter furnishes abundant evidence of the fraudulent schemes and deceptions to which resort was had by the defendant, shared in by the father, and perhaps the stepmother also, whereby, as it would appear, the unfortunate Allen was entrapped into marrying the defendant, upon the representation and assurance that her husband, the present complain-

ant, was dead. Whether all this occurred with the knowledge of the complainant, or when he first became acquainted with the facts in connection with Allen and his wife, is left in doubt and uncertainty; though the fact is disclosed, apparently without intention of having it brought out on the part of the complainant, that when the sister proposed to write and inform the grand jury where her brother was, " he said no, let the matter drop, and not to do anything of the kind." It would appear from this statement that the sister not only knew where her brother was, and was in communication with him, but that she was acting under his direction. The time of this occurrence can only be arrived at inferentially. It would seem to have been some twelve or thirteen years ago, while the witness was residing in Waco.

Upon examination of the very meagre *ex parte* record before us, we cannot resist the conclusion that this is a case where a divorce ought not to be granted. That both parties are guilty of offenses against society would seem to admit of no doubt, and while the conduct of the husband is not shown to have been so flagrant as that of the wife, yet the evidence is sufficient to show that he has no merit to entitle him to the favorable consideration of the court. The case is presented here in a purely *ex parte* manner, with only such facts as the complainant has thought proper to disclose; but those facts thus produced are sufficient to excite grave suspicion, if nothing more, as to the conduct of the complainant. It is manifest that it is not the interest or desire of the guilty wife to defeat this application. But that forms no reason for extending favor to a guilty or unmeritorious husband. As said by the court in the case of *Crewe* v. *Crewe,* 3 Hag. Eccl. Rep. 123, " if the wife does not appear and take the objection, the court will. The husband must lay his case before the court in such a manner as not to give occasion to an inference of collusion or connivance." See also *Timmings* v. *Timmings,* 3 Hag. Eccl. Rep. 76; *Ribet* v. *Ribet,* 39 Ala. 348; *Peck* v. *Peck,* 44 Hun (N. Y.), 290.

The decree below should be affirmed, and it is so ordered.

*Decree affirmed.*